# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>Vance Fields (DOB: XX/XX/1984)<br><br>*Defendant(s)* | )<br>)<br>)  Case No.<br>)<br>)<br>)  **20-M-470 (SCD)**<br>) |

CLERK'S OFFICE
A TRUE COPY
Dec 08, 2020
s/ JeremyHeacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  10/20/2020 and 11/06/2020  in the county of  Milwaukee  in the  Eastern  District of  Wisconsin , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) and 841(b)(1)(B) | Distribution of a controlled substance |

This criminal complaint is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

JEFFREY MILAM
Digitally signed by JEFFREY MILAM
Date: 2020.12.08 12:22:20 -06'00'

*Complainant's signature*

Special Agent Jeffrey Milam (DEA)

*Printed name and title*

Sworn via telephone; transmitted via email pursuant to Fed. R. Crim. 4.1

Date: 12/08/2020

*Judge's signature*

City and state:  Milwaukee, Wisconsin     Stephen C. Dries, United States Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jeffrey Milam, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since September 2014. Before that, I was employed as a police officer with the St. Louis County Police Department in St. Louis, Missouri, where I spent the last three years as a Task Force Officer with the DEA.

2. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws, firearms laws, and money laundering laws, including Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, and Title 18, United States Code, Sections 922, 924, 1956, and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations. More specifically, my training and experience includes the following:

   a. I have utilized informants to investigate drug trafficking. Through interviews of informants and drug traffickers, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

   b. I have also relied upon informants to obtain controlled substances from drug traffickers, and I have participated in undercover purchases of controlled substances from drug traffickers;

   c. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking;

   d. I have been assigned to court-authorized wiretaps and have been trained to operate the equipment used to conduct such operations;

   e. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, drug proceeds, and drug trafficking records were seized;

1

f.  I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base, also known as crack cocaine, and methamphetamine. I am familiar with the methods used by drug traffickers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

g.  I am familiar with the language used over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded;

h.  I know that drug traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking operations. I also know that drug traffickers often change their phone numbers and cellular devices on a frequent basis to thwart law enforcement from tracking their phones and to conceal their identities. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking;

i.  I know that drug traffickers commonly have in their possession, at their residences, and at other locations where they exercise dominion and control drugs, drug proceeds, firearms, ammunition, and records or receipts pertaining to such. I know it is common for drug traffickers to secrete contraband, drug proceeds, and records of drug transactions in secure locations within their residences, their businesses, or other locations over which they maintain dominion and control. These secure locations include, but are not limited to safes, briefcases, purses, filing cabinets, and hidden storage areas in natural voids of a residence;

j.  I know drug traffickers keep on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

k.  I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase or title these assets in order to avoid scrutiny from law enforcement officials;

l.  I know it is common for persons involved in drug trafficking to maintain evidence pertaining to obtaining, secreting, transferring, concealing, or spending of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses, or other locations over which they maintain dominion and control;

m.  I know drug traffickers commonly maintain addresses or telephone numbers in books, papers, or electronic devices that reflect names, addresses, or telephone numbers of their associates in the drug trade; and

2

n. I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession.

3. The information set forth in this affidavit comes from my personal involvement in this investigation, along with information provided to me by other law enforcement officers. Throughout this affidavit, I refer to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.

4. This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint against Vance Fields (DOB: XX/XX/1984) for distribution of a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, and heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).

## **PROBABLE CAUSE**

5. In June 2019, case agents commenced an investigation centered on the distribution of heroin by Vance Fields, also known as "Vito." Case agents identified a middleman, who facilitates drug transactions for heroin and cocaine on behalf of multiple drug traffickers in the greater Milwaukee area. Vance Fields is one of the drug traffickers for whom the middleman facilitates large transactions.

6. Beginning in October 2020, an undercover officer began purchasing drugs from the middleman, who said he obtained heroin from a "Vito" in northwest Milwaukee. (By this time, case agents had conducted surveillance of Fields for several months, with the aid of court-authorized monitoring of the location of Fields's cell phone and vehicles.)

7. On October 19, 2020, the undercover officer called the middleman and asked to buy 50 grams of heroin, saying he needed "50." Case agents believed the heroin would ultimately be provided by Fields. The middleman asked whether the undercover officer needed the "same kind," referring to an earlier drug purchase of heroin. The undercover officer confirmed, and the middleman agreed to meet the next day. The undercover called the middleman again asking about the price, and the middleman said he thought the price would be $65 per gram.

8. On October 20, 2020, case agents provided the undercover officer with $3,000 in pre-recorded buy money, along with an audio-video recording and transmitting device. Case agents had previously installed a court-authorized GPS tracking device on a 2019 Dodge Caravan used by Fields, and went to locate Fields based on that GPS tracking device. A case agent observed Fields exit a Boost Mobile store, located at 6917 West Brown Deer Road, and enter the driver's seat of the 2019 Dodge Caravan. Case agents followed Field's vehicle (along with the GPS tracking device) to an apartment building.

9. The undercover officer called the middleman, and the middleman told the undercover officer to meet him in the vicinity of North 60th Street and West Villard Avenue in Milwaukee. Shortly after, a case agent observed Fields in a parking lot using a cell phone, before Fields left in the Dodge Caravan and stopped at another known location.

10. The undercover officer arrived at 5840 West Villard Avenue, and the middleman told him to get into the vehicle the middleman was in. The undercover officer gave the middleman $3,000 in pre-recorded buy money. About 10 minutes later, case agents observed Fields pull into the same parking lot, where the undercover and the middleman were parked.

11. The middleman exited his vehicle and sat inside of the front passenger seat of Fields's vehicle. He was in Fields' vehicle briefly before returning to his vehicle, where he handed

4

the undercover officer a clear bag containing approximately 50 grams of a tan, chunky substance. This tan, chunky substance later field tested positive for heroin. The undercover officer then got out of the middleman's vehicle and back into the undercover vehicle.

12. On November 4, 2020, the undercover officer called the middleman to obtain 125 grams of heroin, and the middleman called back and told the undercover officer that he could meet the next day.

13. On November 5, 2020, the undercover officer called the middleman, who said he had talked to his source, and agreed to meet the following day.

14. On November 6, 2020, the middleman called the undercover officer, and directed the undercover officer to meet near North 60th Street and West Villard Avenue. Case agents provided the undercover officer $7,500 in pre-recorded buy money, along with an audio-video recording and transmitting device. While en route to the location, the middleman contacted the undercover officer and asked to meet at the corner of North 51st Street and West Villard Avenue instead, saying "meet me over here where "V" at," referring to Vance Fields, also known as "Vito."

15. At about the same time, case agents observed Fields arrive at a house located at 5003 North 55th Street, open the door, and enter. Fields's cell phone was in the same general location according to electronic location information. Case agents observed Fields leave shortly after, get into a green Dodge Caravan, and leave.

16. Surveillance units arrived to the vicinity of North 51st Street and West Villard Avenue around the same time as the undercover officer. Case agents observed Fields's green Dodge Caravan parked in the parking lot of Villard Food & Liquor Mart, located at 5123 West Villard Avenue. Fields's cell phone was in the same vicinity according to electronic location information.

17. The undercover officer pulled into the parking lot, and case agents observed the middleman on foot in the parking lot. The middleman got into the passenger seat of the undercover's vehicle, and the undercover officer parked in the parking lot. The undercover officer provided the middleman a small paper bag containing the $7,500 in pre-recorded buy money. The middleman then exited the undercover officer's vehicle, walked toward Fields's vehicle, and entered the passenger seat. The undercover officer believes that the middleman and Fields appeared to be counting the pre-recorded buy money.

18. After a short while, the middleman exited Fields's vehicle and returned to the undercover's vehicle. The middleman handed the undercover officer the same small paper bag, which now had a clear plastic bag containing approximately 125 grams of an off-white, chunky substance. The middleman told the undercover officer: "You gotta make sure that's the color, right?" before closing the passenger door of the undercover's vehicle. Case agents observed Fields's return to a known location in that same green Dodge Caravan.

19. The off-white, chunky substance was in a large, rectangular piece with three flat edges, suggesting this was broken from a larger, pressed brick of heroin. A later laboratory test showed that this substance weighed 125.8 grams and contained a mixture of fentanyl, heroin, and a cutting agent.

20. Based on the above information and facts, I submit that there is probable cause to believe that Vance Fields has violated the laws of the United States, in that he distributed a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), all in the Eastern District of Wisconsin.